Argued and submitted February 23, affirmed August 8, 2012, petition for review denied March 7, 2013 (353 Or 410)

Kristen M. HOWARD,
*Plaintiff-Appellant,*

*v.*

CHIMPS, INC.,
an Oregon non-profit corporation,
*Defendant-Respondent.*

Deschutes County Circuit Court
09CV0448MA; A145765

284 P3d 1181

Thomas M. Christ argued the cause for appellant. With him on the briefs were Julie A. Smith and Cosgrave Vergeer Kester LLP.

Christopher T. Carson argued the cause for respondent. On the brief were Graham M. Sweitzer and Kilmer, Voorhees & Laurick, P.C.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Hadlock, Judge.

HADLOCK, J.

**HADLOCK, J.**

Plaintiff was an intern at defendant's chimpanzee sanctuary. Before starting her internship, plaintiff signed a waiver releasing defendant from liability for "all claims for death, personal injury, or property damage" arising out of her participation at the sanctuary, including liability arising from negligence or carelessness. Ten days after plaintiff started her internship, a chimpanzee attacked and injured her while she was cleaning a cage. Plaintiff subsequently brought this action, alleging claims for negligence and strict liability. Soon after defendant filed its answer, plaintiff moved for partial summary judgment, arguing that the release was not enforceable. The trial court denied the motion. Defendant subsequently moved for summary judgment on the ground that the release precluded plaintiff's claims. The court granted defendant's motion, and plaintiff appeals. On review for errors of law, we affirm.

The material facts are not in dispute. Defendant operates a wildlife sanctuary that provides refuge for chimpanzees that have come from places like roadside zoos and the entertainment industry. The sanctuary is located on a horse ranch owned by defendant's president, Day, near Bend. The sanctuary is not open to the public, but defendant offers an internship program for people interested in careers in animal conservation, education, or advocacy. According to the manual that defendant provides its interns, the interns were expected to pay $50 per week to cover "materials, curriculum, training, and lodging" unless they were local residents.

Defendant maintains policies designed to shield the sanctuary from scrutiny. For example, defendant's intern manual includes the following nondisclosure agreement:

> "[Defendant's] interns agree that they will not discuss or repeat what they have heard or seen regarding the inner workings of [defendant] nor disclose or use any of [defendant's] confidential information, either during or after their internship. It is difficult for people outside of the sanctuary to understand certain issues (e.g. injuries and escapes). It spreads gossip that inevitably will create a distorted representation of the animals and the sanctuary. For example, if a chimp injures you or another it

is obviously the result of human error. Chimpanzees have extreme upper-body strength, speed and agility. They are intelligent, manipulative and naturally unpredictable. These attributes are compounded when placed in a captive situation; therefore, disregarding the boundaries between you and the chimp can cause bodily harm."

In addition, defendant has a training manual that specifies that only Day, defendant's executive manager, and the ranch manager are authorized to call 9-1-1 and that such calls are to be made only in life-threatening situations. Day acknowledged that the restriction on calling 9-1-1 was intended to avoid "receiv[ing] any unnecessary scrutiny over safety concerns."

In 2008, plaintiff was an anthropology student in college and was interested in working with primates. She applied for, and was accepted into, defendant's internship program. After accepting her application, defendant sent plaintiff a copy of the intern manual, which describes the interns' responsibilities and defendant's policies.[1] Section 2.4 states that the manual "is not a contract of employment of any type between [defendant] and the intern. The relationship between [defendant] and all of its interns can be terminated at any time by [defendant] without advance notice and without any requirement of cause."

The manual includes several provisions that are particularly important to this case. The first is a liability waiver to be signed by the intern:

"Waiver and Release of Liability for [defendant].

"1.   I understand that my execution of this Waiver and Release is a prerequisite for coming to the sanctuary. I further understand that there are risks and dangers inherent for being at the sanctuary.

"2.   I understand that in order to be allowed to be around the chimpanzees, big cats, and on the sanctuary I agree to assume all risks and to release and hold harmless

---

[1] The record does not reflect whether defendant has modified its intern manual since 2008. All discussion of the manual in this opinion refers to the version of the manual that defendant supplied to plaintiff before she commenced work at the sanctuary.

[defendant] and their officers, employees, volunteers, and interns.

"3. I intend by this Waiver and Release to release, in advance, and to waive my rights and discharge all of the persons and entities mentioned above, from any and all claims for death, personal injury, or property damage which I may have, or which may hereafter accrue to me as a result of my participation on the sanctuary, even though this liability may arise from negligence or carelessness on the part of the persons or entities being released, from dangerous or defective property, or equipment owned, maintained or controlled by them or because of their possible liability without fault. I understand and agree that this Waiver and Release is binding.

"4. I have carefully read this Waiver and Release and fully understand its contents. If I am under 18 years of age, my parent or legal guardian has completely reviewed this Waiver and Release, understands and consents to its terms, and authorizes my participation by his/her signature below. I am aware that this is a RELEASE OF LIABILITY and a contract between me and the persons and entities mentioned above and I sign of my own free will."

(Uppercase in original.)

Also significant is a disclaimer that appears at the bottom of every page in the manual, including the page on which the release is printed: "[Defendant,] at its option, may change, delete, suspend or discontinue parts or the policy in its entirety, at any time without prior notice. In the event of a policy change, employees will be notified. Any such action shall apply to existing as well as to future employees." Section 2.8 of the manual similarly states that defendant "reserves the right to modify, suspend, or terminate any of the policies, procedures, and/or benefits described in the manual with or without prior notice to interns." Section 8 reiterates defendant's right to change its policies in a "general acknowledgment" to be signed by the intern:

"I know that [defendant's] company policies and other related documents do not form a contract of employment and are not a guarantee by [defendant] of the conditions and benefits that are described within them. Nevertheless,

the provisions of such policies are incorporated into the acknowledgment, and I agree that I shall abide by its provisions.

"I also am aware that [defendant], at any time, may on reasonable notice, change, add to, or delete from the provisions of the company policies."

After reading the manual, plaintiff spoke with defendant's executive director, Muellner, on the telephone. Muellner told plaintiff that she "would never have physical contact with the chimpanzees." When plaintiff arrived at the sanctuary to begin her internship, another employee, Ross, also assured her that there would be no contact between interns and chimpanzees. Ross told plaintiff that the doors separating chimpanzees and interns would never be unlocked and that, even if a chimpanzee were to escape, it would not be "out to hurt people," but would be intent only on exploring its new-found territory. Neither Muellner nor Ross (or anyone else) told plaintiff that, on at least five occasions, chimpanzees had injured employees, volunteers, and other people on the sanctuary property.[2]

Ross told plaintiff that she would have to sign the release in the intern manual before she could set foot on the sanctuary grounds, and plaintiff did.

A chimpanzee injured plaintiff only 10 days after she arrived at the sanctuary. The attack occurred while plaintiff and another intern, Southland, were cleaning a cage that then was unoccupied, but that was connected by a series of overhead tunnels to other areas that the chimpanzees did occupy. Two doors were located in each of the tunnels. Before she went into the cage, plaintiff asked Ross to show her how the closest of the tunnels locked. According to plaintiff's deposition testimony, Ross "went over and showed us that the pin was in place and there was resistance, that the door would not fold." As it turned out, neither door in the tunnel was actually locked. While plaintiff and Southland were in the cage, a chimpanzee named Kimie came in through the tunnel, jumped on plaintiff's back, hit and bit her numerous

---

[2] We describe each of the incidents in which a chimpanzee injured a human in detail below.

times, and bit off most of her left thumb. Kimie then fled. While defendant's staff members attempted to locate and restrain Kimie, plaintiff left the cage in an attempt to get to the interns' residence. As she approached that building, Kimie saw her and jumped on her again, resuming the attack. Eventually, Kimie relented, and plaintiff was able to escape into the intern house. Southland called 9-1-1 to obtain emergency medical services for plaintiff. After emergency responders arrived, Day approached plaintiff and said, "Who called 9-1-1? It's just your thumb."

Plaintiff brought this action, asserting three claims. In the first, denominated a negligence claim, plaintiff alleged, among other things, that defendant was negligent in failing to secure the doors to the cage plaintiff was cleaning, failing to control Kimie both before and after the first attack, and creating a false sense of security by minimizing the inherent dangers associated with chimpanzees and falsely representing that physical contact between chimpanzees and interns would not occur. Plaintiff's other two claims asserted strict liability under the common law and under ORS 609.329, which creates strict liability for keepers of exotic animals.

In its answer, defendant asserted waiver and estoppel as affirmative defenses, alleging that, in exchange for permission to work at the sanctuary, plaintiff had waived her right to pursue personal-injury claims.

Plaintiff moved for partial summary judgment on the affirmative defenses. She argued that, because defendant retained the right to "modify, suspend, or terminate any of the policies, procedures, and/or benefits" listed in the intern manual, it was not bound by any of the promises it made, rendering its promises illusory. As a consequence, plaintiff argued, there was no contract between her and defendant, and the release, therefore, was unenforceable.

The trial court denied plaintiff's motion. It concluded that the release constituted a separate contract from the rest of the intern manual. The court further concluded that plaintiff received consideration for the release when she was accepted into the internship program, allowed onto the premises, and allowed to work with the chimpanzees.

Accordingly, it ruled that the release was binding on plaintiff at the time of her injuries.

After the court ruled on plaintiff's motion, defendant moved for summary judgment, arguing that the release precluded plaintiff from bringing her claims. In response, plaintiff again argued that the release was unenforceable, this time advancing four grounds in support of her position. First, she argued that it violated public policy, citing ORS 609.309, which provides, in part, "It is the policy of this state to protect the public against health and safety risks that exotic animals pose to the community ***." Second, she asserted that the release was not enforceable because it was not clear and unequivocal regarding the risks that plaintiff would encounter at the sanctuary. Third, plaintiff argued that the release was procured by misrepresentation because defendant falsely assured her that she would not have contact with the chimpanzees and failed to disclose to her the prior incidents in which chimpanzees had injured people. Finally, plaintiff contended that, even if the release barred other claims, it did not relieve defendant of liability for gross negligence.

The trial court ruled that the release did not violate public policy and was clear and unequivocal. It also concluded that plaintiff had failed to present evidence to substantiate her assertion of misrepresentation. With respect to plaintiff's last argument, the court stated that she had "failed to state a claim based upon gross negligence," adding that her claims were "based upon negligence and strict liability." Accordingly, the court again ruled that the release was enforceable, and it entered judgment for defendant.

On appeal, plaintiff assigns error to both the denial of her motion for partial summary judgment and the grant of defendant's motion, renewing the arguments that she made to the trial court. We reject one of those arguments without discussion: plaintiff's contention that defendant made misrepresentations that induced her to sign the release, rendering it unenforceable. We also summarily reject, as unpreserved, the public-policy argument that plaintiff makes on appeal, which is qualitatively different from the argument she advanced below.

We turn to plaintiff's contention that the release was unenforceable because its terms were subject to change by defendant at any time. Plaintiff bases that argument on the intern manual's disclaimer, which, as explained above, states that defendant can "change, delete, suspend or discontinue" any aspect of the policies described in the manual "at any time without prior notice." Given that disclaimer, plaintiff contends, defendant's promises were illusory. Specifically, she argues that the disclaimer meant that defendant was not bound by its promise to allow plaintiff to enter the sanctuary in return for her promise to release defendant from liability for any injury she might suffer there. According to plaintiff, defendant could relieve itself of its promise simply by changing it—"at any time [and] without prior notice." From that premise, plaintiff concludes that there was no mutuality of obligation and, therefore, no contract.

In response, defendant cites Professor Williston, who stated that "mutuality of obligation" is "simply an awkward way of stating that there must be a valid consideration." Samuel Williston, 3 *Williston on Contracts* § 7.14 (4th ed). Defendant argues that both parties gave consideration: plaintiff signed the release and, in exchange, defendant admitted plaintiff to the intern program and to areas of the sanctuary not otherwise open to the public. Defendant contends that, even assuming the provisions of the manual—including the disclaimer—apply to the release, nothing in the manual allows defendant to change its policies or the release *retroactively*. In defendant's view, the manual's disclaimer provisions simply made clear that the internship program was an "at will" relationship.

We agree with defendant that plaintiff and defendant were parties to an enforceable contract at the time that plaintiff was injured. We need not decide whether—as plaintiff contends—no mutuality of obligation existed at the moment the parties signed the contract, before either of them had performed. Whether or not defendant's initial promise to allow plaintiff onto the sanctuary was illusory when the contract was in its executory phase, defendant performed under the contract: it actually allowed plaintiff onto the sanctuary, fulfilling the promise it had made.

That conduct constituted independent consideration for plaintiff's release and cured any previous absence of mutual obligation. *See* Arthur L. Corbin, 2 *Corbin on Contracts* § 6.17 (1995) (absence of mutual obligations can be cured by the parties subsequently acting pursuant to the contract); *see also Petersen v. W. Mich Cmty Mental Health*, 2010 US Dist LEXIS 80479 at *5-6 (WD Mich 2010), *aff'd*, 2012 Fed Appx 0384N (6th Cir 2012) ("[I]t is a basic principle of contract law that '[w]ant of mutuality in the inception of a contract may be remedied by subsequent conduct of the parties or by the execution of the agreement.' Even if a party's promise is illusory when the contract is signed, performance on the contract by that party may serve to cure the defect in that original promise and create a binding contract." (Citations omitted; second brackets in original.)); *Flagship Resort Dev. Corp. v. Interval Int'l, Inc.*, 28 So3d 915, 922 (Fla Dist Ct App 2010) ("Even assuming a lack of mutuality of obligation at the inception of the contract, 'such defect may be cured by the subsequent conduct of the parties.' " (Citation omitted.)); *Ferguson v. Ferguson*, 470 NYS2d 715, 716 (1983) ("Plaintiff's claim that the agreement is illusory * * * because defendant can terminate the contract at will and plaintiff has no such right is without merit [because] the parties operated under the contract for some five years prior to the commencement of this lawsuit."); *cf. NW Gas Supply v. Domestic Gas*, 245 Or 171, 173, 418 P2d 258 (1966) (rejecting the contention that no contract was created because the agreement did not obligate the defendants to purchase from the plaintiff; the arrangement was an invitation by the plaintiff for offers and an acceptance of the offers when the defendant entered each order, resulting in an executed contract when each sale was made). Because defendant gave plaintiff consideration by allowing her onto the sanctuary, and plaintiff signed the release in exchange, the parties had a binding agreement.

Plaintiff's contrary argument is premised on her contention that the disclaimer in the intern manual gave defendant the right to *retroactively* change the terms of the manual by, for example, withdrawing its promise to provide interns with lodging at a rate of $50 per week and, instead, requiring interns to pay a higher rate for the time they already had spent in residence at the sanctuary. In support

of that argument, plaintiff relies on the last sentence in the footer that appeared on each page of the manual, stating that defendant's right to change its policies "shall apply to existing as well as to future employees." According to plaintiff, the reference to "existing" employees means that defendant reserved the right to retroactively change its policies.

We reject plaintiff's retroactive-disclaimer argument for two reasons. First, even if defendant had reserved the right to change the terms of the manual retroactively, it would not have been able to do so with respect to the particular exchange of consideration that matters here: the release that plaintiff gave defendant in exchange for defendant allowing her into the sanctuary. Both parties had performed those promises, and defendant could not retroactively withdraw its promise—it could not somehow take back the time that plaintiff already had spent on site. Accordingly, nothing in the disclaimer could render defendant's promise illusory in that regard. Second, we do not believe the disclaimer language reasonably can be read as plaintiff urges. In our view, the only plausible interpretation of the disclaimer, read as a whole and in context, is that defendant reserved the right to *prospectively* change the terms of employment that applied to both present and future employees. That is, the disclaimer made clear that defendant employed its interns on an "at will" basis, making no promise that the terms of employment described in the intern manual would continue *in the future.*

We turn next to plaintiff's argument that the release is unenforceable as to what she contends is her claim for gross negligence. Plaintiff presents a two-part argument in her appellate briefs. First, she challenges the trial court's ruling that she failed to state a claim for gross negligence. Second—and necessarily premised on her contention that she adequately stated a gross-negligence claim—she argues that the release she signed does not affect that claim because, although it initially purports to release defendant from "any and all claims" that plaintiff might have, it then refers, in a more limited way, to claims for "negligence and carelessness." Because "[t]he phrase 'gross negligence' * * * does not appear in the text of the release," plaintiff argues, this court should consider the circumstances in which she

signed the release and "should conclude that the release does not apply to claims for gross negligence, assuming it is even enforceable."

We do not address the second aspect of plaintiff's argument because we reject the fundamental premise of her contention: that she adequately pleaded *and supported* a gross-negligence claim. Although the trial court decided the question on the pleading point, we take a somewhat different approach. As plaintiff acknowledged during oral argument, because this case was before the trial court on defendant's motion for summary judgment, the burden was on plaintiff to produce evidence from which a jury could infer that plaintiff's injuries resulted from defendant's gross negligence. *See* ORCP 47 C (the party opposing summary judgment "has the burden of producing evidence on any issue raised in the motion as to which the adverse party would have the burden of persuasion at trial"). Accordingly, we have reviewed the record to determine whether it includes any evidence that would support a gross-negligence claim.

To establish gross negligence, plaintiff needed to show that defendant acted with reckless disregard of safety or indifference to the probable consequences of its acts. *See Fassett v. Santiam Loggers, Inc.*, 267 Or 505, 508, 517 P2d 1059 (1973) ("Gross negligence is the equivalent of reckless disregard and is negligence of a substantially greater degree than that of ordinary negligence."); *Rauch v. Stecklein*, 142 Or 286, 293, 20 P2d 387 (1933) ("[G]ross negligence is conduct which indicates an indifference to the probable consequences of the act."). Furthermore, she needed to show that defendant's reckless or indifferent acts caused her injuries.

The conduct that caused plaintiff's injuries was (1) defendant's failure to ensure that the tunnel doors into the cage that plaintiff was cleaning were locked and (2) its failure to control Kimie after the first attack. To show that defendant acted with reckless disregard for safety or was indifferent to the consequences of its conduct, plaintiff relies on the history of chimpanzee attacks on humans at the sanctuary and defendant's policy of secrecy about those attacks. Viewing that evidence in the light most favorable to plaintiff, we conclude that no reasonable juror could find that

defendant's gross negligence caused her injuries. *See* ORCP 47 C ("No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment.").

The history of attacks, while not insignificant, is less damning than plaintiff would have it. According to Day, in 1995 or 1996, shortly after the sanctuary opened, a chimpanzee named Topo pulled a caregiver's arm through an open feeding door hard enough to pull off the skin from her elbow to her wrist. Day acknowledged that defendant had not then had a protocol about feeding only when the chimpanzees were out of range and that safety procedures were a "work in progress," but she stated that the feeding doors had since been secured. In 1996, Topo bit a ranch worker's finger off. Day was not specific about the circumstances of that attack, indicating only that the worker was somewhere "he should not have been." Topo also bit a sanctuary volunteer's finger partially off when she stuck it into his cage. According to Day, that incident occurred "many, many years ago."

The record reflects four other incidents. First, Day testified that another chimpanzee bit her husband on the back while at their home. She stated that the bite drew blood but that the wound did not bleed profusely. Day did not say when that incident occurred. Second, defendant's executive director, Muellner, was bitten on the arm by Kimie about a year before plaintiff was attacked. She testified that she walked too close to an enclosure and Kimie was able to grab her arm. She said that the bite resulted in puncture wounds but did not draw blood. The evidence concerning the third incident is sparse. Southland, the other intern in the cage when plaintiff was attacked, testified in her deposition that she had received a text message from a person identified only as "Tricia" that discussed a runner having been bitten twice by Kimie while running through defendant's property. The record does not indicate when the incident occurred, how serious the bites were, or how the runner came into contact with Kimie. Finally, Day testified that, around December 2009—more than a year after plaintiff was attacked—one of

the sanctuary caregivers, Harbrille, opened a cage door and was playing with the chimpanzees through the door when one of them bit off part of the tip of her thumb. According to Day, Harbrille acknowledged her own fault after the incident.

In short, defendant's history of chimpanzee attacks on humans consists of three serious attacks that occurred very early in defendant's history, one serious attack that occurred more than a year after plaintiff was injured, two attacks that resulted only in minor injuries, and one attack about which essentially nothing is known. Those incidents occurred over the course of more than 14 years. Three of the serious attacks were the result of the victim being somewhere he should not have been or doing something that defendant's current policies clearly prohibit.[3] Significantly—at least so far as the record reflects—none of the incidents resulted from a tunnel door having been left unlocked or from any other circumstance analogous to those that led to plaintiff's injuries. In other words, even if some of defendant's actions might reasonably be viewed as reflecting a *general* indifference to safety (like defendant's policy against calling 9-1-1), no evidence connects those acts to the injuries that plaintiff suffered here. Put differently, no reasonable juror could find that the history of attacks and defendant's secrecy policy demonstrate a reckless disregard of safety or an indifference to the consequences of leaving a tunnel door unlocked while people are in one of the chimpanzee's cages. Nor do they suggest that defendant's failure to control Kimie after the first attack was a product of recklessness or indifference.

The Supreme Court's opinion in *Rauch* helps explain our point. In that case, the court described gross negligence in the context of guest-passenger tort claims:

"A motor-host who drives in a manner which indicates that he has no concern for consequences and an indifference to the rights of others is said to be guilty of gross negligence. The injury which he inflicts is not entirely inadvertent. His mental qualities, therefore, differ from those of another

---

[3] A list of safety rules in the intern manual states, among other things, "NEVER lean against or put bodily parts or clothing inside the cage or within reach of the chimpanzees. This may cause minor or major injury to you." (Uppercase in original.) The record does not indicate whether a similar policy was in place when the volunteer's finger was bitten off.

who is guilty of only ordinary negligence. The condition of mind of the driver who plunges on ahead, grossly negligent of the rights of others, may not be such that we can say that his tortious acts are willful or wanton, but his mind is at least indifferent to the rights of others or displays those rash qualities exhibited by the foolhardy."

142 Or at 293-94. Neither defendant's history of chimpanzee attacks nor its secrecy policy evinces the qualities that the court described in *Rauch*. The record simply includes no evidence from which a juror could infer that plaintiff's injuries resulted from anything other than "entirely inadvertent" negligence. It follows that plaintiff did not meet her burden of coming forward with sufficient evidence to defeat defendant's motion for summary judgment on any gross-negligence claim. Consequently, the trial court did not err in granting summary judgment in defendant's favor.

Affirmed.